United States District Court
Southern District of Texas
**ENTERED**
June 21, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| IN THE MATTER OF | § | |
| THE EXTRADITION OF | § | Case No.  4:21-mj-02673 |
| BOCIOG DUMITRU | § | |

§
§
§
§
§

## ORDER ON REQUEST FOR EXTRADITION

By Complaint filed on December 17, 2021, the United States, on behalf of the Government of France, seeks the extradition of Bociog Dumitru to France.  Dkt. 1.  Dumitru filed a Motion for Release from Custody pending his extradition hearing, which was denied.  Dkts. 12, 14.  The United States then filed a Memorandum of Law in Support of Extradition.  Dkt. 18.  Dumitru filed a response, Dkt. 23, to which the United States replied.  Dkt. 24.  On May 13, 2022, the Court held a hearing on extradition.  After the hearing, the parties filed supplemental memoranda.  Dkts. 29, 30, 31.

For the reasons stated below, the Court certifies that Dumitru is extraditable to France.

### Background

### A.    Dumitru was convicted in absentia by a French court.

On June 16, 2021, the Judicial Court of Grasse tried Dumitru on criminal charges for (i) robbery with violence leading to total incapacity to work and (ii) arrest, kidnapping, sequestration or arbitrary detention of hostages to ensure

1

escape or impunity. Dkt. 25-1 at 223. The French authorities had arrested Dumitru on these charges, and he was released on bail pending trial. *Id.* at 217 (Judicial Court of Grasse's request for provisional arrest in United States).

Dumitru failed to pay his bail or appear at trial. *Id.* Because he failed to appear, Dumitru was tried in absentia and convicted pursuant to French Penal Code Articles 311-1, 311-4, 311-5, 311-11, 311-14, and 311-15 (robbery) and 224-1, 224-4, 224-9, and 224-11 (sequestration). Dkt. 25-1 at 214-16 (Judicial Court of Grasse request for provisional arrest), 232-33 (Criminal sentence from the Judicial Court of Grasse). Dumitru's two co-defendants were present for the trial, and Cassandra Winkel, one of the victims, appeared live to provide her statement to the court. *Id.* at 231-32. The court sentenced Dumitru to four years of criminal imprisonment, followed by a ten-year prohibition from entering French territory. *Id.* at 234, 236. That same day, the Judicial Court of Grasse issued a warrant for Dumitru's arrest. *Id.* at 220-26 (European arrest warrant).

On December 7, 2021, the French District Attorney affiliated with the Judicial Court of Grasse requested that the French Minister of Justice issue a provisional arrest warrant for Dumitru. *Id.* at 197-209. The Public Prosecutor of France concurrently issued a request for provisional arrest to all "competent judicial authorities of the United States." *Id.* at 210-19.

### B.     Subsequently, Dumitru was arrested in the United States, and the United States now seeks his extradition to France.

Dumitru was arrested in the Brownsville Division of the Southern District of Texas.  Dkt. 25-6 at 1 (U.S. Marshals Service Report).  In an interview with the U.S. Marshals Service, Dumitru confirmed his name and birthdate.  *Id.*  He also acknowledged that he left France after he was charged with several offenses and that he had not returned since.  *Id.* at 1-2.  On December 17, 2021, the United States filed an initial complaint for his extradition.  Dkt. 1.

On February 7, 2022, the Embassy of France formally requested the extradition of Dumitru.  Dkt. 25-1 at 1 (Decl. of S. Hauf).  The Ministry of Justice of France provided the U.S. Department of Justice supporting materials relating to the extradition request.  *Id.*  The State Department has proffered that these documents, which bear the certificate or seal of the French Ministry of Justice or Ministry or Department responsible for foreign affairs, are authentic and admissible evidence under the Treaty.  *Id.* at 2.

The United States filed a Memorandum of Law in Support of Extradition, attaching the affidavit of the United States Department of State's advisor, the proffered extradition treaty, and records from the French Ministry of Justice and Ministry for Europe and Foreign Affairs.  Dkt. 18 (Government's Memorandum), 18-1 (Supporting Documentation to Memorandum).  Dumitru

responded to the United States' memorandum, objecting to extradition.  Dkt.

23.  The Court held an extradition hearing on May 13, 2022, and the parties

have submitted responsive and supplemental briefing on these three issues.

*See* Dkts. 24 (Government's Reply); 25, 27 (Government's Exhibit List and

Exhibits); 26 (Dumitru's Sur-Reply); 29 (Government's Supplemental

Memorandum); 30 (Dumitru's Response to Supplemental Memorandum); 31

(Government's Supplement to Memorandum).[1]

## Legal Standard

International extradition proceedings are governed both by statute and

by treaty.  *See* 18 U.S.C. § 3184.  When applying an extradition treaty, courts

construe it liberally in favor of the country requesting extradition.  *Factor v.*

*Laubenheimer*, 290 U.S. 276, 293-94 (1933).  The courts' review is limited

because "[e]xtradition ultimately remains an Executive function."  *Martin v.*

*Warden, Atlanta Pen*, 993 F.2d 824, 829 (11th Cir. 1993); *see generally*

18 U.S.C. §§ 3181-95 (setting forth the parameters of judicial review).

Pursuant to 18 U.S.C. § 3184, the Court need only make the following

findings in order to certify the extradition to the Secretary of State: (a) the

---

[1] After the hearing, the United States and Dumitru filed "supplemental" memoranda that mirrored their pre-hearing briefs.  *Compare* Dkts. 18, 23, *with* Dkts. 29, 30.  Both sides submitted these to correct issues with citations to the record evidence.  Because the briefs are substantially identical otherwise, the Court will cite the later-filed versions of these briefs.

judicial officer is authorized to conduct the proceeding; (b) the Court has jurisdiction over the fugitive; (c) a valid extradition treaty exists between the United States and France; (d) the offense charged is extraditable under the treaty; and (e) there is a reasonable basis of finding probable cause that Dumitru committed the offense for which the extradition is sought. *See Ntakirutimana v. Reno*, 184 F.3d 419, 423-24 (5th Cir. 1999); *see also Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1402 (9th Cir. 1988); *In re Extradition of Valentino*, 2018 WL 2187645, at *4 (S.D. Tex. May 11, 2018).

Courts "leave to the State Department" the resolution of concerns about the fairness of the requesting state's practices and proceedings. *See generally Ntakirutimana*, 184 F.3d at 430 (collecting case law for the "rule of non-inquiry"); *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997) (courts should "refrain from investigating the fairness of a requesting nation's justice system") (internal quotation marks omitted). The State Department's final determination proceeds even after a court has certified that a fugitive is extraditable. At that point, the "Secretary of State conducts an independent review of the case to determine whether to issue a warrant of surrender." *Martin*, 993 at 829. During its review, the Secretary "exercises broad discretion and may properly consider myriad factors affecting both the individual defendant as well as foreign relations which an extradition magistrate [judge] may not." *Id.*

5

## Analysis

Dumitru objects to extradition on three grounds: (1) because it was fundamentally unfair for the French legal system to have tried and convicted him *in absentia* without a lawyer; (2) because France's extradition request omitted the text of the French Penal Code statutes under which he was charged; and (3) there is no probable cause that he committed any crime with "violence" or that he detained his victims "to ensure escape or impunity," as required by the relevant statutes of the French Penal Code.  Dkt. 30.

After review of the evidence and authorities, the Court finds that Dumitru's objections lack merit.  The Court further finds that each factor is satisfied, and Dumitru's extradition is certifiable under 18 U.S.C. § 3184.  *See Ntakirutimana*, 184 F.3d at 423-24.

## I.     **The judicial officer is authorized to conduct the proceeding.**

This Court is authorized to conduct the extradition proceeding and certify the extradition.  Under the extradition statute, a magistrate judge authorized by a court of the United States may conduct the extradition hearing and certify the extradition.  18 U.S.C. § 3184.  The Southern District of Texas authorizes magistrate judges to perform "all of the duties allowed by law," including extradition proceedings.  L.R. 72.

## II.    The Court has jurisdiction over Dumitru.

The Court has jurisdiction to extradite "any person found within [the court's] jurisdiction."   *See* 18 U.S.C. § 3184.   Dumitru was arrested in the Southern District of Texas by the United States Marshals Service.   Dkt. 27 at 5 (Report of the U.S. Marshals Service).   After appearing in court in the Brownsville Division of this District, Dumitru confirmed his identity to the Marshals and acknowledged his prior arrest in Grasse, France.   Dkt. 27 at 6. He has subsequently appeared in court in the Houston Division of the District without contesting his identity or the Court's jurisdiction.   Accordingly, the Court finds that it has jurisdiction over Dumitru.

## III.   A valid extradition treaty exists between the United States and France.

### A.    There is no dispute that the United States and France have an extradition treaty.

The United States has a valid extradition treaty with France.   *See* Extradition Treaty Between the United States of America and France, U.S.-Fr., Apr. 23, 1996, S. Treaty Doc. No. 105-13 (1997) (with amendments, "the Treaty").[2]   The United States has attached both the English and French versions of the Treaty and its amendments.   Dkt. 25-1 at 6-35, 59-65 (English);

---

[2] The treaty was subsequently amended by the Instrument as contemplated by Article 3, paragraph 2 of the Agreement on Extradition Between the United States of America and the European Union signed on 25 June 2003, and by the application of the Extradition Treaty Between the United States of America and France signed on 23 April 1996, U.S.-Fr., Sept. 30, 2004, S. Treaty Doc. No. 109-14 (2006).

*id.* at 36-58, 66-71 (French).  It has also proffered the affidavit of Stacy Hauf,

an Attorney Adviser in the Office of the Legal Adviser for the Department of

State, who opined that the Treaty is in effect.  *Id.* at 1-2.  Dumitru does not

challenge the validity of the Treaty.

Based on Ms. Hauf's opinion and the United States' proffer of the English

and French texts, the Court finds that a valid extradition treaty exists.  *See*

*Sayne v. Shipley*, 418 F.2d 679, 683-84 (5th Cir. 1969) (citing *Terlinden v.*

*Ames*, 184 U.S. 270 (1902), and noting that the Executive Branch "is entitled

to great weight and importance" regarding the conduct of foreign affairs).

**B.     France's in absentia proceedings do not obviate the Treaty's enforceability.**

Rather than attack the existence of the Treaty, Dumitru argues that the

enforcement of the Treaty would violate his fundamental rights.  Specifically,

Dumitru argues that France's extradition request "is based on a conviction that

was entered *in absentia* and without a lawyer" which violated a "fundamental

right under the United States Constitution."  Dkt. 30 at 3.  As a result, he

contends that his extradition to France will result in a four-year imprisonment

"based on a fundamentally unfair process" that violated his constitutional right

to representation by counsel.  *Id.* at 3-4.  This argument is unpersuasive.

This Court's review under § 3184 is limited and cannot inquire into

fairness of France's trial procedures nor what awaits Dumitru if he were

returned.  *See Ntakirutimana,* 184 F.3d at 430 (declining to reach the merits of the fugitive's arguments that his due process rights and right to counsel under the United States Constitution would be violated in Rwanda).  The Supreme Court has made clear that a foreign government need not allow American citizens more procedural safeguards than are "allowed to its own people ...."[3]  *Neely v. Henkel,* 180 U.S. 109, 123 (1901).  This is because the protections flowing from United States Constitution "have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country."  *Id.*

As a natural corollary, the U.S. Constitution "cannot be extended extraterritorially" beyond our jurisdiction.  *Kamrin v. United States*, 725 F.2d 1225, 1228 (9th Cir. 1984) (citing *Holmes v. Laird*, 459 F.2d 1211 (D.C. Cir. 1972)).  Thus, the only relevant inquiry when determining Dumitru's extraditability is whether "the acts of the United States Government" have complied with the Constitution, "not [whether] those of a foreign nation" have. *Prushinowski v. Samples*, 734 F.2d 1016, 1018 (4th Cir. 1984).

Dumitru does not complain of any constitutional violations by the United States, nor does he indicate there was any reason he did not participate in his

---

[3] Dumitru does not argue that France violated its own procedures in trying him *in absentia* or without representation.

French trial, but-for his fleeing that jurisdiction.  His grievances arise solely out of the fairness of his prosecution in French court.  Dkt. 30 at 1-3.  But the case he cites as precedent for denying extraditability turned on other issues—probable cause and dual criminality—and not the "shocking" unfairness of the foreign proceedings.  *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1372-73 (S.D. Fla. 1999) (finding that the court "need not address whether this case and the egregious set of facts [that] it presents" because extradition could be denied on other grounds).  It does not provide a relevant precedent to override the established rule of non-inquiry.

Dumitru's objection is therefore unavailing in this limited proceeding.  It appeals, instead, to the State Department's interest in foreign policy and diplomacy.  *See Matter of Requested Extradition of Smyth*, 61 F.3d 711, 714 (9th Cir.), *amended sub nom. Matter of Smyth*, 73 F.3d 887 (9th Cir. 1995). ("Undergirding [the rule of non-inquiry] is the notion that courts are ill-equipped as institutions and ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into and pronouncements about the workings of foreign countries' justice systems.").  This Court declines to inquire into the fairness of the French legal system or the enforceability of the Treaty, as "there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed."  *Kin-Hong*, 110 F.3d at 111; *see also United States v.*

10

*Bogue*, 1998 WL 966070, at \*2 (E.D. Pa. Oct. 13, 1998) ("A determination of the French government's procedural fairness in undertaking the petitioner's trial in his absence, however, is beyond the scope of this Court's review.")

## IV.   The offenses charged are extraditable under the Treaty.

### A.   Dumitru's offense is extraditable because it would be punishable by United States and Texas law.

The Treaty is a "dual criminality" treaty that defines extraditable acts as those that are "punished under the laws in both States by a deprivation of liberty for a maximum of at least one year or by a more severe penalty." Dkt. 25-1 at 11-12 (Treaty, Art. 2). "Extradition shall be granted for an extraditable offense committed outside the territory of the Requesting State, when the laws of the Requested State authorize the prosecution or provide for the punishment of that offense in similar circumstances." *Id.* at 12. "The dual criminality requirement 'does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions.'" *Quintanilla v. United States*, 582 F. App'x 412, 414 (5th Cir. 2014) (quoting *Collins v. Loisel,* 259 U.S. 309, 312 (1922)).

The United States identified the domestic laws that would criminalize Dumitru's acts in France.  It argues that 18 U.S.C. § 1951 (Robbery) and

11

18 U.S.C. § 1201 (Unlawful Confinement) are U.S. federal analogues to Dumitru's charges for "theft with violence" and "arbitrary detention" under the French Penal Code. Dkt. 29 at 10.[4] Ms. Hauf of the State Department also opined that Dumitru's charges in France are covered as extraditable acts under Article 2 of the Treaty. Dkt. 25-1 at 2.

Dumitru's acts, as found by the French court, would have been criminalized by these domestic laws. Dumitru and his co-defendants stole forty phones and 117 phone accessories valued at approximately €29,000. *Id.* at 211. They also forced their way into the store, confiscated the employees' personal phones, and detained them in a storeroom while the robbery was taking place. *Id.* at 210. Such actions would fall within chargeable federal offenses in the United States. Any distinctions between the United States Code and French Penal Code are not sufficient to remove Dumitru from the scope of the Treaty, as the "offenses in the two countries punish the same basic evil," even if they do not "contain identical elements." *Zhenli Ye Gon v. Holt*, 774 F.3d 207, 210 (4th Cir. 2014). Strict construction and comparison of the statutes is not required, because extradition treaties should be "interpreted with a view to

---

[4] The United States later, in its reply brief, suggested that Texas law would criminalize Dumitru's acts if federal law does not. Dkt. 24 at 8. Specifically, Texas Penal Code § 29.02 (robbery) would cover Dumitru's theft from the store, and Texas common law, as well as Texas Penal Code § 20.03, prohibits kidnapping the store's employees. *Id.* Because the federal statutes are sufficiently analogous to the French statutes, the Court need not analyze these later-identified criminal statutes.

fulfill our just obligations" to foreign states. *Grin v. Shine*, 187 U.S. 181, 184 (1902).   Accordingly, the Court finds that dual criminality exists, and Dumitru's charges fall within the scope of the Treaty.

>    **B.    The French government provided the relevant language of the French Penal Code.**

Dumitru does not dispute the fact that his acts would have been illegal in the United States and thus satisfy dual criminality.   He instead raises a technical challenge to France's compliance with Article 10.2 of the Treaty, which requires France to provide "the text of the provisions describing the offense for which extradition is requested."   Dkt. 30 at 4-5; Dkt. 25-1 at 18 (Article 10.2(c)).   In support of this argument, he refers to a specific page of the French arrest warrant that provided mere summaries of the French Penal Code.   Dkt. 30 at 4-5 (citing Dkt. 25-1 at 227).

A complete review of the United States' exhibits negates Dumitru's contention.   Dumitru was found guilty of violating, and sentenced pursuant to, French Penal Code Articles 311-1, 311-4, 311-5, 311-11, 311-14, and 311-15 (robbery) and 224-1, 224-4, 224-9, and 224-11 (sequestration).   The full text of these articles was provided in the French District Attorney's extradition request to the French Minister of Justice.   Dkt. 25-1 at 202-05.   That text appeared again in the French court's request for provisional arrest to United States authorities.   *Id.* at 214-16.   These pages, which were not identified by

Dumitru, contain statutory text—not summaries.  Accordingly, the Court finds

that the French authorities complied with the Treaty by providing the statutes

under which Dumitru was tried and sentenced.

**V.      There is probable cause to conclude that Dumitru committed the offenses for which the extradition is sought.**

**A.      The Court may consider Dumitru's conviction *in absentia.***

Finally, the Court turns to the probable cause analysis, determining

"whether the evidence shows a reasonable ground to believe the accused

guilty."  *See Ntakirutimana*, 184 F.3d at 424.  Finding probable cause does not

require "resolution of conflicting evidence that a reasonable-doubt or even a

preponderance standard demands," but rather asks if the "evidence supports a

reasonable belief in guilt."  *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975).

In general, when a fugitive has been convicted in the requesting state's

courts, "there is no need for an 'independent' determination of probable cause."

*Spatola v. United States*, 925 F.2d 615, 618 (2d Cir. 1991).  But when the

fugitive was tried *in absentia*, the conviction is not dispositive.  *See generally*

*In re Extradition of Ferriolo*, 126 F. Supp. 3d 1297, 1300 (M.D. Fla. 2015)

(treating *in absentia* convictions as criminal charges, not convictions).

Instead, the conviction *in absentia* is evidence that may be considered by

this Court in an extradition proceeding.  *In the Matter of Extradition of*

*Valentino*, No. 4:18-MJ-00146 (S.D. Tex. Jan. 23, 2020), ECF No. 72 at 9 (citing

*Fernandez v. Phillips*, 268 U.S. 311, 311 (1925)) (Bray, M.J.); *Bogue*, 1998 WL 966070, at \*2 ("[A] conviction, although obtained *in absentia,* provides sufficient evidence of criminality to satisfy the probable cause requirements of 18 U.S.C. § 3184."). The foreign conviction is competent evidence in an extradition proceeding, because the Federal Rules of Evidence are inapplicable. Fed. R. Evid. 1101(d)(3) ("extradition or rendition" are exceptions to the applicability of the Federal Rules of Evidence); *see also Haxhiaj v. Hackman*, 528 F.3d 282 (4th Cir. 2008) (probable cause "requires more detail than mere proof of the *fact* of conviction … but it clearly does not require the kind of actual evidence suggested by [the fugitive], such as trial testimony or transcripts"). As such, this Court may consider the United States' exhibits as evidence of probable cause, so long as that evidence meets the requirements of the Treaty. *See id.*; Dkt. 25-1 at 2 (declaration of S. Hauf attesting to the authenticity of the United States' evidence in accordance with the Treaty).

**B.    There is sufficient evidence to support probable cause that Dumitru's used "violence" and intended to "ensure escape or impunity."**

Dumitru argues that the United States did not proffer sufficient evidence to establish probable cause for either crime. First, Dumitru contends that there is insufficient evidence that Dumitru's acts were violent—even though he was convicted under Article 311 of French Penal Code's provisions for "robbery with violence." Dkt. 30 at 6-7 (citing the Judicial Court of Grasse's

15

Arrest Warrant, Dkt. 25-1 at 227).   Second, Dumitru argues that there is

insufficient evidence that the detention of the store employees was done to

"ensure the escape or impunity," as required by Article 224 of the French Penal

Code.  *Id.*[5]  The Court disagrees.

The Judicial Court of Grasse, France issued a criminal sentence for

Dumitru after he failed to appear at his trial.  Dkt. 25-1 at 229-40 (Criminal

Sentence).   One of the victims, an employee of the telecommunication store,

appeared at the trial to give her statement.  *Id.* at 229, 232.  Dumitru's two co-

defendants were also present and heard at the trial.  *Id.* at 232.  Following the

sentence, the Judicial Court of Grasse issued a request for Dumitru's

provisional arrest, and the French District Attorney issued its extradition

request.  Dkt. 25-1 at 197-209 (extradition request), 210-219 (provisional arrest

request).   The factual background for Dumitru's conviction and arrest is

recounted in both:

- Three individuals robbed a telecommunications store staffed by employees Julian Dorlhac and Cassandra Winkel.  Dkt. 25-1 at 210.

- The individuals knocked on the store's service door and, when Mr. Dorlhac opened the door, one of perpetrators "violently pushed" him.  *Id.* Ms. Winkel described their entry as "burst[ing] into the store."  *Id.* at 212.

---

[5] Dumitru did not contest the authenticity or admissibility of the United States' evidence.  Even if he had, the United States need not have provided the actual video evidence, photographs, or DNA results that were referenced in the French documents and are discussed below.  *See Haxhiaj*, 528 F.3d at 289.

- A surveillance video captured the breach of the store. The French authorities reviewed the video and characterized the entry as "violent." *Id.*

- One of the men was distinguishable because he was wearing a straw hat. *Id.* at 211. This man "aggressively ask[ed]" the store employees "where the phones were." *Id.* at 210. He also "forced the two employees to open the storeroom" where they were detained while the others "unloaded the merchandise." *Id.* at 212.

- Ms. Winkel said that she "advised Mr. Dorlhac to open the storeroom for" the perpetrators "[i]n view of their aggressiveness." *Id.* at 212.

- Once in the storeroom, the perpetrators took Mr. Dorlhac's personal cell phone. *Id.* The employees were only able to call emergency services because they located a phone in the storeroom that happened to have an active SIM card. *Id.* at 210.

- When the authorities arrived on scene, Ms. Winkel "was found to be in a state of shock." *Id.* She was put on "total work incapacity" for anxiety characterized by "nightmares, hypervigilance, [and] sleep disorders." *Id.* at 211. Mr. Dorlhac was also placed on "total work incapacity" because he "showed symptoms suggestive of post-traumatic stress (sleep disorders, nightmares, excessive sweating, hypervigilance)." *Id.*

- Both employees "thought that their assailants were armed, one of them having a mass at the belt which could correspond to a firearm and the others holding an object in their hand." *Id.* at 198, 211.

- Ms. Winkel and Mr. Dorlhac's psychological symptoms persisted, and they were "dismissed from their jobs for inaptitude because they had been unable to return to work following the events." *Id.* at 213.

Video surveillance of the exterior of the store indicated that the man in the straw hat threw away a Coca Cola can from a nearby bakery. *Id.* at 211. The man was identified by Mr. Dorlhac as a perpetrator, and the can was collected for DNA sampling. *Id.* at 211-12. The DNA profile was matched to Dumitru and Dumitru's aliases. *Id.* at 212; *see also id.* at 162-185 (genetic

17

expertise report and judicial requisition for DNA profiles). When questioned by the U.S. Marshals Service, Dumitru confirmed his name and identity. Dkt. 25-6 at 1 (U.S. Marshals Service Report).

Given that there is evidence that Dumitru was the perpetrator in a straw hat, the Court finds that there is probable cause that Dumitru both acted with "violence" and with the intent to detain the store employees to ensure his "escape or impunity." Even disregarding acts that may be attributable to his co-defendants, there is evidence that Dumitru entered the store and "aggressively" demanded to know where the desired merchandise was. Dkt. 25-1 at 212. Dumitru then "forced" the employees into the storeroom in a manner that intimidated Ms. Winkel into advising Mr. Dorlhac to comply. *Id.* at 199. After Dumitru forced the employees into the storeroom, Mr. Dorlhac's phone was confiscated so that he could not call the authorities while the perpetrators were stealing merchandise. *Id.* at 210, 212. The victims apparently perceived the event to be threatening enough that both experienced serious psychological symptoms, which ultimately led to their inability to work. *Id.* at 210. This was, in part, because Dumitru led both employees to believe that they may face threat of violence by a weapon, as he either had a "mass at the belt" or unknown "object in [his] hand." *Id.* at 198, 211.

Given the evidence, Dumitru's acts can be fairly characterized as "violent" and intended to achieve, in part, his "escape or impunity." The Court

18

finds probable cause—*i.e.* enough evidence to support a reasonable belief, *Gerstein*, 420 U.S. at 121—that Dumitru violated Articles 224 and 311 of the French Penal Code.[6]

## Conclusion

Based on the findings above, the Court finds that Bociog Dumitru is extraditable to France for each offense for which extradition is requested. The Court hereby certifies this finding to the Secretary of State as required under 18 U.S.C. § 3184.

---

[6] At the hearing, the parties disputed the overlap in elements between domestic and French criminal charges. They also disputed whether Dumitru may be extradited under a French analogue to "aiding and abetting," if the violent acts or the acts intended to ensure escape or impunity could only be attributed to his co-defendants. The United States provided a supplement on the topic. Dkt. 31. Dumitru sought the opportunity to respond to the supplement, but ultimately did not file anything further on the topic. Nevertheless, the Court need not consider these issues or any subsequent briefing for two reasons.

First, the Court's probable cause inquiry analyzes whether Dumitru committed the offenses charged by the French authorities. *See Ntakirutimana*, 184 F.3d at 430. It is irrelevant whether Dumitru's conduct would have constituted "aiding and abetting" or whether he could have been charged as an accomplice or accessory under our domestic laws. Analyzing potentially parallel domestic crimes conflates probable cause with the concept of dual criminality—a separate requirement.

Relatedly, because this extradition proceeding analyzes only the offenses charged by the French authorities, it does not matter if the French Penal Code also recognizes "aiding and abetting" or "accomplice" offenses. The only relevant offenses in the Code are those under which the French sought extradition: Articles 224 and 311. *See* Dkt. 25-1 at 197-209 (extradition request).

The Court's analysis must focus narrowly on Articles 224 and 311 of the French Penal Code and the extradition request. *See* Dkt. 25-1 at 202-05, 214-16 (relevant text of Articles 224 and 311). Even with this limitation, the Court finds that there is probable cause to support the charges against Dumitru.

It is **ORDERED** that a warrant may issue for the surrender of the defendant to the proper authorities of the Government of France in accordance with the Extradition Treaty between the United States of America and France.

It is further **ORDERED** that **BOCIOG DUMITRU** is committed to the custody of the United States Marshal, or his authorized representative, to be confined in an appropriate facility and to remain until he is surrendered to the Government of France pursuant to applicable provisions of the Treaty and United States law.

It is further **ORDERED** that the United States Attorney for the Southern District of Texas shall forward a copy of this Certification and Order, together with a copy of all transcripts of the proceedings and copies of the documents received in evidence in this matter, to the Secretary of State.

It is so ordered.

Signed on June 21, 2022 in Houston, Texas.

_____
Yvonne Y. Ho
United States Magistrate Judge